UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        )
                                 )
        v.                       )   Criminal No. 16-202
                                 )
SULTAN SAAD N. ALORINI,          )
SHVAB ANDRIY, AND ELDAR          )
REZVANOV,                        )   Washington, D.C.
                                 )
        Defendants.
_____          Wednesday, November 23, 2016
                                     2:00 p.m.
                                     (Afternoon Session)

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

  For the Government:            STEVE WASSERMAN, AUSA
                                 GEORGE P. ELIOPOULOS, AUSA
                                 U.S. Attorney's Office
                                 555 Fourth Street, NW
                                 Washington, DC 20530

For the Defendant Alorini:      DANNY C. ONORATO, ESQ.
                                 STUART ALEXANDER SEARS, ESQ.
                                 Schertler & Onorato
                                 575 7th Street, NW
                                 Suite 300 South
                                 Washington, D.C.  20004

For Defendant Andriy:           DAVID BARRY BENOWITZ
                                 Price Benowitz LLP
                                 409 Seventh Street, NW
                                 Suite 200
                                 Washington, DC  20004

For Defendant Rezvanov:         ROBERT A. FEITEL, ESQ.
                                 3509 Connecticut Avenue, NW
                                 Suite 1291
                                 Washington, DC  20008

```
Court Reporter:        BRYAN A. WAYNE, RPR, CRR
                       U.S. Courthouse, Room 4704-A
                       333 Constitution Avenue, NW
                       Washington, DC 20001
                       (202) 354-3186
```

```
Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Now we are back on the record.

 3      Mr. Feitel, I will again ask that you please confirm that

 4  Mr. Rezvanov is able to hear.

 5          MR. FEITEL:  Thank you, Your Honor.  He can.

 6          THE COURT:  Thank you very much.  And of course it

 7  remains the case that neither your client, Mr. Sears, or

 8  Mr. Onorato -- I'm sorry -- Mr. Benowitz, neither of your

 9  clients require the assistance of the interpreter?

10          MR. BENOWITZ:  That's right.

11          THE COURT:  Thank you very much.

12      At the time we recessed for lunch, the Court had heard the

13  extent of the parties' arguments.  We asked that someone from

14  Pretrial Services -- and we thank you for your assistance,

15  Mr. Atencio -- please address any update of the information

16  provided by Pretrial Services last week.

17      Ordinarily, this would not be necessary, but since time has

18  passed and counsel have made various representations to matters

19  which had or had not been verified, I believe it appropriate to

20  hear from you.  Thank you very much.

21          PRETRIAL OFFICER:  Good afternoon, Your Honor.

22          THE COURT:  Good afternoon.

23          PRETRIAL OFFICER:  Saul Atencio, Pretrial Services.

24      Your Honor, I'd like to go, first of all, over the first

25  defendant, Mr. Alorini.  The Defendant was able to verify an
```

1    address in Virginia where the Defendant would be staying with

2    relatives.  An ICE check was done on the 10th, and it did not

3    indicate that there was a detainer but that Mr. Alorini was

4    undergoing deportation proceedings.

5        However, after consulting his defense counsel, they

6    presented a form from his attorney, immigration attorney,

7    indicating that his removal proceedings have been removed.

8    The document looks authentic.  It is a copy, but I will leave

9    it to defense counsel to make that representation.

10            THE COURT:  May I ask you, Mr. Atencio, to please

11   state the details of what you mean by "removal proceeding" and

12   "removal proceeding removed."

13            PRETRIAL OFFICER:  Basically, Your Honor -- well, what

14   I can interpret, I'm not an expert with Immigration and Customs

15   Enforcement, but it indicates that there is some form of

16   proceeding, administrative proceeding, with Mr. Alorini in

17   reference to his status here in the United States.  It is very

18   unclear.  The query -- the return that we received from the ICE

19   is very vague, and I will read to the Court exactly what it

20   said.

21            THE COURT:  Very well.  I will ask you to read it,

22   please.  Thank you.

23            PRETRIAL OFFICER:  It basically states, Your Honor,

24   "ICE records indicate that Subject is legally in the

25   United States.  However, Subject is currently under removal

1    proceedings," and there's a statement there.

2        I do want to inform the Court, at the beginning of this

3    query, it indicates that it's not a government detainer; it's

4    simply a flash or -- or I guess information on the defendant.

5        With that being said, Your Honor, I would probably defer to

6    counsel to explain as far as what they produced and brought to

7    my attention, documentation from Mr. Alorini's immigration

8    attorney and the other information with that.

9        THE COURT:  Thank you, Mr. Atencio.  May I ask whether

10   that is the only additional information available to Pretrial

11   Services concerning Mr. Alorini?

12       PRETRIAL OFFICER:  That is, Your Honor.

13       THE COURT:  You referred to an address in Virginia

14   which has been verified.  I do not want you to state the address

15   on the record.  I will ask only that you state what

16   relationship, if any, Mr. Alorini has to the premises or the

17   occupants of the premises.

18       PRETRIAL OFFICER:  The address belongs to his sisters,

19   who I have spoken to, and they have offered Mr. Alorini the

20   opportunity to stay there while his case is pending.  And they

21   have been explained as to how the High Intensity Supervision

22   Program runs, and they were in agreement with our policy and

23   procedure.

24       THE COURT:  Does that mean that Pretrial Services --

25   or what has Pretrial Services determined whether or not

1    Mr. Alorini is eligible for the High Intensity Supervision

2    Program?

3              PRETRIAL OFFICER:  He is eligible.  I would just like

4    that defense counsel just clarify to the Court, because we were

5    uncertain as far as -- we were a little hesitant because of the

6    alert from ICE.  We don't want the defendant being released on

7    personal recognizance and then being placed in ICE custody.

8    However, the information that we received did not indicate it

9    was a detainer, and there was no detainer lodged against

10   Mr. Alorini while he was in D.C. jail.

11             THE COURT:  You may have anticipated the Court's next

12   question.  Is it your understanding that -- what is your

13   understanding whether or not there is a detainer?

14             PRETRIAL OFFICER:  There is no detainer, Your Honor,

15   according to D.C. jail, in reference to Mr. Alorini.  So with

16   that, the defendant is eligible for the High Intensity

17   Supervision Program.  However, like I said, I do want to alert

18   the Court that there is that information in the system regarding

19   his status.

20             THE COURT:  Thank you very much, Mr. Atencio.  We

21   appreciate that.  You may turn your attention now to Mr. Shvab.

22             PRETRIAL OFFICER:  Mr. Shvab is a naturalized citizen.

23   I was able to speak to his mother; and he will be able to stay

24   with her in Northern Virginia, and the address has been verified.

25             THE COURT:  Thank you very much, Mr. Atencio.  You may

1   proceed to Mr. Rezvanov.

2   　　　　PRETRIAL OFFICER:  In reference to Mr. Rezvanov,

3   Your Honor, Mr. Rezvanov has a legal -- excuse me -- an ICE

4   detainer in the system.  It was lodged, I guess, once he was

5   placed in custody, and it's listed under Immigration and Customs

6   Enforcement.  So, at this time, Mr. Rezvanov would not be

7   eligible for the High Intensity Supervision Program.

8   　　　　THE COURT:  Mr. Atencio, thank you very much.

9   　　　　PRETRIAL OFFICER:  Thank you, Your Honor.

10   　　　　THE COURT:  Mr. Atencio, while you're at the podium,

11   I would ask whether counsel would like to ask Mr. Atencio any

12   questions while he's at the podium.

13   　　Do you, Mr. Eliopoulos, have any questions for Mr. Atencio?

14   　　　　MR. ELIOPOULOS:  I do not, Your Honor, although I do

15   concur with Mr. Atencio regarding counsel to actually explain

16   his immigration status.

17   　　　　THE COURT:  Very well.  Thank you, Mr. Eliopoulos.

18   　　Mr. Onorato, do you have questions, or do you, Mr. Sears,

19   for Mr. Atencio while he's here at the podium?

20   　　　　MR. ONORATO:  No, Your Honor, only that I heard him to

21   say that there are no ICE detainers on my client, and if that's

22   correct, then I have no questions.

23   　　　　THE COURT:  Very well.  Mr. Benowitz?

24   　　　　MR. BENOWITZ:  No, Your Honor.  The only thing I would

25   say just on the record, as I said I believe yesterday, I'm in

1    possession of Mr. Shvab's passports.  So, to the extent that

2    Mr. Atencio needs them, I can provide them.

3              THE COURT:  Thank you, Mr. Benowitz.

4         Mr. Feitel, do you have questions for Mr. Atencio while

5    he's here at the podium?

6              MR. FEITEL:  Good afternoon, Your Honor.  I do.

7    I spoke to Mr. Atencio before court began.  I think he was of

8    the mind that, because my client has an immigration detainer,

9    ordinarily people do not ask --

10             THE COURT:  Well, let me ask whether you have

11   questions for him.

12             MR. FEITEL:  Yes.  My question is whether or not

13   it's prohibited for him to be in the HISP program, whether it's

14   simply not ordinarily done because people don't want their

15   clients to go into immigration detention.  I explained to

16   Mr. Atencio that if the consequence of him getting released to

17   the program is that he goes to immigration detention, that's

18   fine with us because I'll deal with the issue of release status

19   in the immigration court.

20             THE COURT:  Thank you, Mr. Feitel.

21        Mr. Atencio, is that a matter or a concern to which you

22   wish to respond?  You're not required to.  If you wish to add

23   something concerning the program requirements, you may.

24             PRETRIAL OFFICER:  As I explained to Mr. Feitel,

25   usually our procedures with any placement in the High Intensity

1    Supervision Program, if a defendant has a detainer,

2    automatically he or she is ineligible for the program due to

3    that, and we would be unable to supervise him being that, just

4    in this situation, if ICE were to take custody of Mr. Rezvanov,

5    we wouldn't know exactly when he would be free in the community,

6    and the purpose of the program is to basically supervise him

7    electronically in his location at all times.

8         So, with any sort of detainer, be it immigration or

9    probation detainer, we would find him ineligible for supervision

10   in our program, Your Honor.

11             THE COURT:  And when you say for supervision, do you

12   mean any supervision, including personal recognizance with

13   conditions.

14             PRETRIAL OFFICER:  Correct, Your Honor.  That would

15   exclude the person from --

16             THE COURT:  Meaning the most minimal to the most

17   rigorous.

18             PRETRIAL OFFICER:  That is correct, Your Honor.

19             THE COURT:  Very well.  Thank you, Mr. Atencio.

20             PRETRIAL OFFICER:  Thank you, Your Honor.

21             THE COURT:  I believe it is appropriate at this time

22   to ask, although I believe you have made exhaustive arguments

23   thus far, but is there anything further, beginning with you,

24   Mr. Eliopoulos, that you wish to offer or proffer, either by way

25   of response to Mr. Atencio or otherwise?

1          MR. ELIOPOULOS:  No, Your Honor, only requesting that

2    Mr. Onorato discuss the concerns regarding Mr. Alorini.

3          THE COURT:  You have made that request, Mr. Eliopoulos.

4    Thank you.

5          MR. ONORATO:  Your Honor, I don't know.  Mr. Sears,

6    I think, may have given the Court a copy of his green card.

7    I have another copy if it's not handy.

8          THE COURT:  Have you shared that with Mr. Eliopoulos?

9          MR. ONORATO:  Yes, Your Honor.

10          THE COURT:  It appears to be the document already

11    admitted as Defendant Alorini Exhibit 2.  I'll hand over the one

12    with the exhibit sticker.  If it is the same document, then we

13    need not --

14          MR. ONORATO:  It is.

15          THE COURT:  -- do anything further.

16      You agree, do you not, Mr. Eliopoulos, that the exhibit has

17    already been admitted?

18          MR. ELIOPOULOS:  Yes, Your Honor.

19          THE COURT:  All right.  Thank you.

20      Now, Mr. Onorato, what is your argument?

21          MR. ONORATO:  I don't know if it's an argument as much

22    as an explanation.

23          THE COURT:  Well, your explanation.

24          MR. ONORATO:  Your Honor, if you look at the top of

25    the document, it says "Department of Homeland Security,

United States Citizenship and Immigration Services."  Below that it says "Notice of Removal of Conditional Basis of Lawful Permanent Residence."

So, through his immigration lawyer, we learned that he was conditionally given permanent resident status, and through her efforts, if you look at the first paragraph with the "Congratulations!  Your request for the removal of the conditional basis of permanent resident status has been approved.  You are deemed to be a lawful permanent resident of the United States as of the date of your original admission or adjustment of status."

That date, of course, was dated November 10 of 2016.

THE COURT:  And is the reference -- well, what is your understanding -- I'll ask you the same question, Mr. Eliopoulos -- of the reference to "the date of your original admission"?  It appears to be November 16, 2013, and indeed, it was for that reason that the Court may have referred to 2013 in asking counsel a question about this rather than 2016.

MR. ONORATO:  So I am not a hundred percent certain, but my understanding is that the day that you file for your green card petition, they consider your admission date that date: November 16 of 2013.  At that point, they granted him a conditional lawful permanent resident status.

It has now been adjusted where he has a lawful permanent resident status, and that decision took effect on November 10 of

this year.  But as Mr. Atencio I think has confirmed, if there's

an issue with his deportation status, if there were proceedings

against him, there would be a detainer lodged against him.  And

in fact, this document illustrates that the removal I believe

that he is referring to is the removal of the conditional basis

of lawful resident status to a permanent basis.

MR. SEARS:  Your Honor, I apologize.  Mr. Onorato

couldn't comment on this because I just did this in the hallway.

I'll tell the Court that Mr. Alorini is represented on the

immigration matters by a lawyer by the name of Moona Shakil Ali,

the Law Office of Moona Shakil, PLLC, which is located in

Arlington, Virginia.

THE COURT:  So the record is clear, do we agree that

that is the name and address which appears on Defendant Alorini

Exhibit 2?

MR. SEARS:  Very good point, Your Honor, yes.

That is so.  I have been in constant contact with Ms. Ali since

we were retained to represent Mr. Alorini.  She has received no

notification of there being any sort of removal proceedings or

any adverse action taken against Mr. Alorini.  She would be the

person to be notified.

I asked her every day this week before I came to court

whether there was any update in that status.  She would check

some system and advise me that there had been no update.  She

eventually gave me the phone number.  There's a phone number you

1    can recall to find out whether you're in removal proceedings.

2         That phone number is 1-800-898-7180.  I called that number

3    approximately five minutes ago in the hallway.  I put in

4    Mr. Alorini's A Number, and it advised that there's no record of

5    any proceedings against him.  And that's as of five minutes ago,

6    Your Honor.

7              THE COURT:  Very well.  Thank you, Mr. Sears.

8         Mr. Eliopoulos, do you have questions, or request that the

9    Court direct questions to either Mr. Onorato or Mr. Sears

10   concerning this matter?

11             MR. ELIOPOULOS:  I do not, Your Honor.

12             THE COURT:  Very well.  Thank you very much,

13   Mr. Eliopoulos.  I'm going to assume for the moment -- or

14   perhaps I should simply ask, before I hear from you, Mr. Feitel,

15   Mr. Sears or Mr. Onorato, what is your request regarding

16   conditions of release?

17             MR. SEARS:  Your Honor, as I indicated, I think we

18   would request that Mr. Alorini be released into the High

19   Intensity Supervision Program.  I'd ask that he be permitted to

20   live at the residence in Arlington with his sisters, and to the

21   extent the Court feels it's necessary, that his sister Dema,

22   the one who's currently pursuing her Ph.D. at Howard, be his

23   custodian.

24             THE COURT:  Very well.  Thank you, Mr. Sears.

25        Mr. Benowitz, what is your request?

1          MR. BENOWITZ:  Your Honor, my request on behalf of

2     Mr. Shvab is that he be released on his personal recognizance

3     with conditions such as a curfew.

4          My concern -- in speaking with Mr. Atencio, I know

5     Mr. Shvab has been deemed eligible for the High Intensity

6     Supervision Program, but my concern is that -- and my

7     understanding of the first phase of the High Intensity

8     Supervision Program is often a thirty-day, essentially, house

9     arrest period, and that would cost him his job.

10          So that is my concern.  If I am mistaken about that first

11     period, or if the Court can do something to ameliorate that to

12     allow Mr. Shvab to resume his employment, then we would not

13     object to the High Intensity Supervision Program, and we'd

14     request that.

15          THE COURT:  Thank you, Mr. Benowitz.

16          Mr. Atencio, I believe I should ask you to address that.

17     It is my understanding that a court has discretion should it

18     order high intensity supervision to order that the first three

19     weeks be -- I would say the first interval of two to three weeks

20     be served in home confinement but that the court also has

21     discretion to order otherwise.  Is that still the case?

22          PRETRIAL OFFICER:  Yes, Your Honor.

23          Actually, the Court has at least three options.

24     The first option would be the home confinement phase, which

25     would basically -- the defendant would be at home for 30 days.

1    And depending on how the defendant does in that mode, they would

2    be moved over to curfew supervision, which then he would be

3    allowed to go out and have a curfew from 6:00 a.m. to 10:00 p.m.

4    with conditions to report to his case manager, drug test weekly,

5    and any other contact as directed by the Court.

6         The Court could also recommend permanent home confinement,

7    where the defendant would remain at home at all times except for

8    an excused doctor's permission or any appearances with the court

9    or any other special conditions that the Court may ask for the

10   defendant to do or attend.

11        And the last one, of course, is curfew supervision, which

12   would basically the defendant would be on a curfew with the

13   hours that I stated previously, from 6:00 a.m. to 10:00 p.m.,

14   Monday through Sunday, seven days of the week, with conditions

15   to report to the case manager, drug tests, and any other contact

16   as required by Pretrial Services.

17             THE COURT:  Thank you, Mr. Atencio.

18        Now, Mr. Feitel.

19             MR. FEITEL:  Your Honor, my client's immigration

20   detainer poses a conflict.  If he did not have this criminal

21   case, in my experience, which is not complete but I've had some

22   experience with clients in this situation, if you're here on a

23   visa stayover, which is my client's situation -- he came on a

24   student visa and stayed over -- if he were arrested into a

25   detainer and he was sent to immigration detention, he would have

1     a chance to argue for bond in front of an immigration judge.

2     Because there's the detainer, he's not eligible to have that

3     happen or to go into High Intensity Supervision.

4          So what I'd ask Your Honor to do is to fashion different

5     conditions of release.  I ask that he be released to personal

6     recognizance with the requirement that he check in every day,

7     that he live at the address that we will provide to Pretrial,

8     and that he be ordered to have a curfew of 9:00 a.m. to 6:00

9     p.m.

10         Then I'd also ask Your Honor to order that if he is

11    released from immigration custody, that he be ordered to report

12    back to the court, and then we can discuss High Intensity

13    Supervision.  If we do nothing, he'll simply stay in the system

14    where others would be let out.  If he could get in front of an

15    immigration judge, we'd have a fair opportunity to convince him

16    to give him a bond, and I ask for that opportunity to do so.

17    And I'd also be willing to surrender his passport to the custody

18    of the court as part of the conditions of release.

19             THE COURT:  Mr. Feitel, you referred to "an address in

20    Virginia."  Has that address been provided to Pretrial Services?

21             MR. FEITEL:  I will.  As I mentioned earlier,

22    Mr. Rezvanov's roommate could verify the information.  He's

23    currently out of the country.  But if Your Honor schedules it,

24    I could make it happen on Monday.  His roommate will be back,

25    and I'd be glad to bring the roommate down to the courthouse.

He's indicated that he would agree to that.  He would also agree
to be a custodian if Your Honor so desires.

THE COURT:  Thank you, Mr. Feitel.  Mr. Feitel, I do
have one question.  Before we began, my law clerk provided the
two of you with a copy of what she was able to locate on Westlaw
concerning the provision under Pennsylvania law for the programs
to which you have referred.  To the extent there is any comment
you wish to make on that, I will hear from you now.

MR. FEITEL:  The only comment I have to make is that
the statute and the case say that it is not a conviction.  He
is in the process to have it expunged, and to the extent that
there's any evidentiary or probative value, I think it is *de
minimis*, as I said earlier.

THE COURT:  Very well.  Thank you, Mr. Feitel.

Do you wish to address that matter, Mr. Eliopoulos?
When I say "that matter," I mean the statute.

MR. ELIOPOULOS:  Thank you, Your Honor.  Your Honor,
I think the statute does support what the Government argued
earlier today, that the Defendant --

THE COURT:  It does not support what the Government
argued yesterday, however: There is a conviction.

MR. ELIOPOULOS:  It would be counted as a conviction
in subsequent cases, particularly in light of the fact that
those cases also involved electronic fraud, the type of case
which we believe may have precipitated the kidnapping at issue

1    in this case.  Again, that's something that the Court should

2    consider in determining whether to hold this defendant without

3    bond.  So the Government would continue to request that

4    Mr. Rezvanov and the other defendants be held without bond.

5         Thank you, Your Honor.

6         THE COURT:  Thank you very much, Mr. Eliopoulos.

7         It appears that all counsel have completed their offers and

8    proffers of evidence, all counsel have completed the arguments

9    that the counsel wish to assert, the Court has heard the update

10   of the information provided to the Court by the Pretrial

11   Services Agency, all exhibits that anyone intends to offer have

12   been moved into evidence, and I believe we are now ready to

13   continue.  We'll proceed to the Court's ruling.

14        This is, of course, day three of a detention hearing

15   commenced on Monday.  The charge underlying this proceeding is,

16   of course, at this time the one-count indictment alleging a

17   kidnapping by the three individuals now before the Court.

18        I will note parenthetically that, at this time, the Court

19   sees no occasion to address the discrepancies and omissions in

20   the indictment that have been pointed out later, believing that

21   those are matters to be addressed by the assigned U.S. district

22   judge upon motion.

23        A court conducting a detention hearing is, of course,

24   directed to consider the four factors set forth at 18 U.S. Code

25   § 3142(g), the first of which is the nature and circumstances of

the offense charged.  The offense charged is indeed a crime of violence, and the Court has so considered.

The second factor is the one which has occasioned much of the attention of counsel and the attention of the Court, and that is the weight of the evidence against the person.

The Court finds, for reasons which will be stated in greater detail in a moment, that the weight of the evidence is scant as it concerns the offense charged, and largely for that reason the Court believes that the Government has failed to carry its burden.

The Court makes the reference to the Government carrying its burden because this is not a case, as all of you recognize, in which there is a presumption of dangerousness or fugitivity, making it incumbent upon the Government to demonstrate by clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of the community, or by the lesser standard, a preponderance that no condition or combination of conditions would reasonably assure the appearance of the individuals charged.

As it concerns the weight of the evidence, the Court notes that the evidence offered by the Government -- and, indeed, much of the argument by counsel for the Government -- concerns what I believe we can reasonably infer for this purpose was evidence of a form of apparent assault in an apartment in Hyattsville, Maryland.

However, the Court finds that the Government has offered no nexus between the evidence with respect to the apparent criminal conduct in an apartment in Hyattsville, Maryland, and a kidnapping in the District of Columbia.

The Court believes that is an important distinction because, as I noted at the outset, the offense charged in the District of Columbia is kidnapping under federal law, and if there is -- if the weight of the evidence with respect to any kidnapping in the District of Columbia is such that the Court must regard it as scant, then there is little basis upon which the Court could find that evidence regarding something else is at all probative.

Working backwards, the Court finds first that the Government has not even proffered that any of the individuals now before the Court were identified by the Complaining Witness as the individuals who kidnapped him.  That was a matter that the Court noted as part of the Government's passing reference to an identification by the Complaining Witness of the three individuals as those who engaged in a form of assault in the apartment in Maryland.

However, there has been no identification of any type proffered or offered by the Government that any of the three individuals now before the Court were involved or perpetrated a kidnapping in the District of Columbia.

Many of the questions of counsel for the defendants on

cross-examination are -- the answers to those questions are

illustrative of the Court's conclusion that the evidence of a

kidnapping at all is scant are numerous in the record.

    Apart from the fact that the Complaining Witness has not

even identified the defendants as those who perpetrated any

kidnapping, the FBI agent, the lead investigator on the case,

quite frankly acknowledged that he undertook an effort to locate

witnesses either working at the hotel or in the vicinity of the

hotel to determine what any of them may have observed, and the

only inference that the Court can draw from the rather vague

answer that was given is that, to the extent that anyone was

interviewed who was present at the time, no one saw anything

that was consistent with the Complaining Witness's report.

    There is no evidence that has been offered by the

Government with respect to any witness reports of a crime of

violence, no record with respect to any surveillance video at

the hotel or in the vicinity, no evidence that any of the three

-- other than the report of the Complaining Witness, that any of

the three individuals charged was present in the District of

Columbia at the time or the times alleged.

    There is no evidence with respect to when or where any

injuries to the Complaining Witness occurred.  There's no

evidence with respect to when any duct tape or restraints were

applied.

    The Government, in its argument, made much of the supposed

failure of counsel for the defendants to "talk about the evidence."  The Court notes in the first instance that it is not incumbent upon the defendants to offer evidence with respect to the weight of the evidence, nor could they in this circumstance since the Government sought to return an indictment prior to a preliminary hearing and has not, at least as of the last time this matter was discussed, made full discovery to counsel for the defendants.

Notwithstanding that, however, there are two significant items of evidence bearing upon the Court's finding regarding the weight.  One of them, of course, is the communication from the Complaining Witness to Witness 1 during the time that he was allegedly being restrained in Hyattsville in which no reference was made to his having been abducted from the District of Columbia and transported to Maryland.

The other is a receipt in the car, the black vehicle, indicating it can reasonably be inferred that the person the Government characterizes as the fourth abductor had stopped at -- if we are to accept for the moment the Government's theory that there was a kidnapping in the District of Columbia, then went to Spider Kelly's and had food and drinks, leading a reasonable jurist to question how that is consistent with an argument that four people forced the Complaining Witness into a vehicle.

Next, with respect to the weight of the evidence, the Court

1    notes that yesterday the Court, during the argument of Government

2    counsel, made note of the number of disclosures which the Court

3    characterized as <u>Brady</u> disclosures.  That characterization may

4    have been disputed to some extent, but nonetheless, counsel for

5    the Government acknowledged that during the course of this

6    proceeding, the Government had made four or five -- and we'll

7    put quotation marks around "four or five" -- disclosures of

8    evidence which could be regarded as favorable to the Defense.

9    The Court characterizes that number as an inordinate number of

10   such disclosures in a relatively short period of time.

11       More to the point, however, the Court finds that the

12   disclosures relate directly to the second issue, and that is

13   the weight of the evidence.  Our circumstance now, of course,

14   is that the only evidence of any kidnapping in the District of

15   Columbia is the report of the Complaining Witness.  The Court

16   has noted that the Complaining Witness has not even identified

17   the defendants as the individuals who allegedly kidnapped him.

18       But putting that aside for the moment, the Court believes

19   that in weighing the weight of the evidence, the Court must take

20   into account the various inconsistent statements made by the

21   Complaining Witness concerning the alleged kidnapping.

22       The Court can only conclude that such inconsistencies and

23   changing accounts weaken the weight of the evidence, rendering

24   it, when considered as a whole, scant on the issue of whether or

25   not the Complainant was kidnapped in the District of Columbia.

1    Moving to the third factor, history and characteristics of

2  the person, the Court believes there is very little dispute

3  regarding the actual evidence that has been offered or proffered

4  and further explained by Pretrial Services, both in writing and

5  on the record this afternoon.

6    That means, of course, that the presence of Mr. Alorini

7  in the United States is a lawful presence as of -- as the Court

8  reads the exhibit, 2013, but if not, certainly as of the present,

9  and there are not currently any proceedings under way, that

10  Mr. Alorini has no prior criminal history, and all of the

11  information provided either by counsel on his behalf or to or

12  through Pretrial Services has been verified.

13    Mr. Shvab is a U.S. citizen and, like Mr. Alorini, has no

14  prior record; and like Mr. Alorini, all information provided to

15  the Court through his counsel or through Pretrial Services has

16  been verified.

17    Much has been made regarding contacts that either

18  Mr. Alorini or Mr. Shvab or both of them may have outside the

19  United States.  However, the Government has offered no evidence

20  whatsoever during the course of this proceeding that any such

21  communication has ever been attempted in the context of the

22  matter now pending or that there is any factual basis in support

23  of the contention that, if released, there is something about

24  the contacts -- and the Court must use the vague reference "to

25  some other countries" since no specifics have ever been

1   articulated -- that would warrant a finding by the rigorous

2   *clear and convincing* standard that there is a danger to the

3   community, broadly read, or to any identifiable individual.

4       With respect to the fourth matter, the Court's finding is

5   largely the same as it is with respect to the third.  The fourth

6   factor requires that the Court assess the nature and seriousness

7   of the danger to any person or to the community which would be

8   posed by the individual's release.

9       However, the Government has proffered nothing concerning

10  any specific danger, and in context with respect to the other

11  findings that the Court has already made, the Court would be

12  required to simply speculate that merely because there has been

13  an allegation largely unsupported by any evidence offered or

14  proffered here in court that there was a kidnapping in the

15  District of Columbia, that there is a danger to the community or

16  to any identifiable person in the community which would be posed

17  by the individual's release.

18      To the extent that the Government may have a concern

19  regarding -- and an understandable concern regarding the

20  Complaining Witness -- any danger to the Complaining Witness,

21  the Government has effectively acknowledged that the Complaining

22  Witness is in a secure location.

23      For these reasons, the Court finds that the Government has

24  failed in the requirement that it demonstrate by a preponderance

25  of the evidence that no condition or combination of conditions

1    would reasonably assure the appearance of the individuals before

2    the Court or by clear and convincing evidence that no condition

3    or combination of conditions would reasonably assure the safety

4    of the community; and thus, the motion for pretrial detention

5    must be denied.

6         The Court, therefore, must set the least restrictive

7    conditions to reasonably assure the safety of the community and

8    the appearance of the individuals charged in court, and as to

9    Mr. Alorini and Mr. Shvab, the Court finds that the conditions

10   are those of the High Intensity Supervision Program with other

11   conditions.

12        As to Mr. Rezvanov, the Court believes that this matter

13   must be continued until Monday because, as of this time,

14   Pretrial Services has not had an opportunity to verify the

15   information that would be the basis of the condition proposed

16   by Mr. Rezvanov's counsel.

17        Thus, the hearing for Mr. Rezvanov will be continued by the

18   Court -- in other words, by the Court's own motion -- to Monday,

19   and if you bear with us, we will provide the time in just one

20   moment.  (The Court conferring with the Deputy Clerk.)

21        Two p.m. on Monday, November 28, assuming that you,

22   Mr. Eliopoulos, and you, Mr. Feitel, will be available.  We can

23   make it later in the day if you like.

24             MR. FEITEL:  Thank you, Your Honor.  No, that will be

25   fine, and I'll be here or I'll have somebody else stand in my

1    place.  I'm going to have someone else enter an appearance, but

2    someone will be here on Monday.

3            THE COURT:  Thank you, Mr. Feitel.

4        Mr. Eliopoulos, will you or Mr. Wasserman be here Monday at

5    2:00?

6            MR. ELIOPOULOS:  Yes, Your Honor.  One of us will be

7    here, or else we'll have somebody stand in.

8            THE COURT:  Thank you very much.

9        Now, in making these findings, the Court notes that no

10   finding has been made regarding any of the matters including the

11   sufficiency of the indictment and the request for sanctions for

12   Brady violations, arguments regarding prosecutorial misconduct.

13       The Court has made no findings with respect to any of

14   those.  I do not intend to make findings with respect to any of

15   those matters.  I believe those are all matters appropriately

16   addressed in writing upon full briefing to be determined by the

17   assigned U.S. district judge in due course.

18       Now, Mr. Alorini and Mr. Shvab -- you may remain seated,

19   Mr. Rezvanov.  Now, the Court at this time will order the

20   following conditions of release:

21       You are released on the condition that you comply with all

22   of the requirements of the High Intensity Supervision Program.

23   You must each reside at the address which has been verified by

24   Pretrial Services that will be discussed when Mr. Atencio from

25   Pretrial Services speaks with you.  These conditions are orders

1   of the Court, and you must comply with each of them.

2       I will include the requirement of electronic monitoring

3   as one of the conditions.  I will also order that you stay away

4   from Hyattsville, Maryland, as a further condition.  In other

5   words, you are to -- and Mr. Atencio, I'll need your help how to

6   articulate this for purposes of the program requirements.  The

7   requirement is largely one of home detention with leave to leave

8   the residence only to go to work or meet with counsel.

9           PRETRIAL OFFICER:  That is correct, Your Honor.  That

10  would be permanent home confinement, Your Honor.

11          THE COURT:  Would that permit Mr. Alorini and

12  Mr. Shvab to work?

13          PRETRIAL OFFICER:  Actually, I misspoke, Your Honor,

14  when I addressed the Court earlier, that -- if, for instance,

15  work is involved, he would be -- the option would be community

16  supervision, which would enable him with a curfew, and he would

17  be required to be home by 10:00 o'clock or whatever time the

18  Court would prefer the defendant to be at.  But traditionally,

19  he would be allowed to go to work in the daytime and then come

20  back, and also report to Pretrial.

21          THE COURT:  Thank you, Mr. Atencio.

22      Mr. Shvab, I'll ask you to have a seat, sir.

23      What is your proffer, Mr. Onorato, concerning Mr. Alorini's

24  customary days and hours of employment?  We, of course, have

25  evidence concerning verification of his presence at the workplace

1    identified during the hours which are the subject of the log

2    and the screenshots, but let me ask you to state that for the

3    record, please, since Mr. Atencio was not present during that

4    portion of the evidence presentation.

5                MR. ONORATO:  Your Honor, we'd request 7:00 a.m. to

6    7:00 p.m. so he can leave for the office and get there with

7    traffic and then get home.  He leaves at 6:00, generally, and

8    gets back by 7:00.  That would be our proposal.

9                THE COURT:  Thank you, Mr. Onorato.

10   Mr. Atencio, is that something that can be accomplished by

11   way of electronic monitoring, or should the Court order GPS

12   monitoring?  The Court's intention is to order that -- and we'll

13   hear from Mr. Benowitz in a moment concerning Mr. Shvab.  I'm

14   speaking only of Mr. Alorini now.  My intention is to order the

15   equivalent of home detention with leave to go to work, appear in

16   court, and meet with counsel and nothing else.

17               PRETRIAL OFFICER:  Yes, Your Honor.  That could be

18   achieved.  I just want to explain to the Court that the

19   technology that Pretrial Services uses now is able to switch

20   back and forth from location monitoring at the home.  Once the

21   defendant steps out of the residence, it automatically switches

22   to GPS, and it starts tracking the defendant and his movement

23   throughout the day.

24   So, if he leaves the residence, as long as the defendant

25   has the device on him.  So we would be able to achieve that,

1    Your Honor, with that time.  We could indicate home confinement

2    except for the hours the Court has specified.

3                THE COURT:  Thank you very much, Mr. Atencio.

4                PRETRIAL OFFICER:  Thank you, Your Honor.

5        Mr. Benowitz, what is your proffer concerning the days and

6    hours of Mr. Shvab's employment?

7                MR. BENOWITZ:  Your Honor, Mr. Shvab works Monday

8    through Friday.  His work hours are 8:30 to 5:30, and since he'd

9    be living Alexandria, Virginia, he would need about an hour

10   travel time each way.

11               THE COURT:  Very well.  Thank you, Mr. Benowitz.

12       In both cases, the Court's order is the equivalent of home

13   confinement with authorization to leave home only for the

14   purpose of going to work, meeting with counsel, coming to court,

15   and nothing else.

16               PRETRIAL OFFICER: Your Honor, may Pretrial be heard?

17               THE COURT:  Yes.  And I apologize.  I neglected to

18   include the next court date.

19               PRETRIAL OFFICER:  Your Honor, since tomorrow is a

20   federal holiday, the defendants will be released today from D.C.

21   jail and will not be under any sort of electronic supervision

22   until Friday, the 25th of November.

23               THE COURT:  Can the Court stay the order until Friday

24   when supervision can formally commence?

25               PRETRIAL OFFICER:  We'll have a technician available,

but I just want to let the Court know that they will not be

supervised for 48 hours.

THE COURT:  The Court's intention is to await the

installation of the supervision protocols, and you believe that

will take place on Friday.

PRETRIAL OFFICER:  That is correct, Your Honor.

We could set it up that way as well.  I'll indicate that in

the release order.

THE COURT:  I will ask you to do that, please.

Thank you.

PRETRIAL OFFICER:  Thank you, Your Honor.

THE COURT:  And I neglected to include the next court

date.  I believe that is Tuesday, November 29.  Mr. Sears?

MR. SEARS:  I believe it was set at 11:30 in the

morning?

THE COURT:  Is that everyone's recollection?

MR. ELIOPOULOS:  Yes, Your Honor.

THE COURT:  Very well.  11:30 a.m. in the courtroom of

Judge Contreras.

Mr. Alorini and Mr. Shvab, the release order, which is

stayed until Friday, will also require that you appear in court

whenever your appearance in court is required.  Your next

scheduled court date is Tuesday, November 29, at 11:30 a.m.

The courtroom number will be included on the release order.

You are advised that your willful failure to appear on that

1    date or at any other time your appearance in court is required

2    would be a separate offense for which you could face an

3    additional period of incarceration or a fine or both.

4         Do you each understand?

5              DEFENDANT ALORINI:  Yes, Your Honor.

6              DEFENDANT SHVAB:  Yes, Your Honor.

7              THE COURT:  Very well.  You are also advised to

8    discuss with counsel the penalties for violations of any of the

9    conditions of the release order, including the order to stay

10   away from the -- specific order to stay away from Hyattsville,

11   and I will include or ask Mr. Atencio to include as well -- what

12   is Mr. Petrovs' first name?

13             MR. SEARS:  I believe it's Daumants, Your Honor.

14   D-A-U-M-A-N-T-S.

15             THE COURT:  From Daumants Petrovs.

16        Mr. Atencio, Mr. Eliopoulos is coming to give you the

17   spelling.  You may be seated.

18             MR. ELIOPOULOS:  Your Honor, before we break, the

19   Government would request that the Court --

20             THE COURT:  Well, we're not finished yet.  Yes, would

21   you please give the spelling to Mr. Atencio.

22        Mr. Atencio, did you receive the courtroom number?

23             PRETRIAL OFFICER:  Yes, Your Honor.

24             THE COURT:  It's 14?

25             PRETRIAL OFFICER:  Yes, Your Honor.

1          THE COURT:  Okay.  Thank you.  The Court realizes

2     that there is a further condition that the Court intended to

3     include but did not, and that is that you, Mr. Alorini, and you,

4     Mr. Shvab, have no passport in your possession nor make

5     application for any passport while this matter is pending.

6          MR. BENOWITZ:  Your Honor, before we conclude, I

7     would like to approach *ex parte*.

8          THE COURT:  We haven't quite concluded.  I would

9     like Ms. Kay to have the opportunity to swear Mr. Alorini and

10    Mr. Shvab to the conditions.  I believe I will hear next from

11    Mr. Eliopoulos, who I believe has a concern to raise, and then

12    I will hear from you.

13         MR. BENOWITZ:  Sure.  Thank you.

14         THE DEPUTY CLERK:  Mr. Shvab and Mr. Alorini, would

15    you please stand and raise your right hand.

16       (Defendants are sworn to abide by conditions of release.)

17         THE COURT:  Thank you.  You may be seated.

18       Now, Mr. Eliopoulos.

19         MR. ELIOPOULOS:  Thank you, Your Honor.  The

20    Government would request that the Court stay its ruling on

21    detention, at least until the end of the day today, to allow

22    the Government to take an appeal.

23         THE COURT:  You do recall that I indicated that the

24    order is stayed until Friday.

25         MR. ELIOPOULOS:  But I believe the Court has already

```
1    ruled on whether the Government satisfied its burden of proof

2    for detention.

3              THE COURT:  That is correct, Mr. Eliopoulos.

4    To go directly to the heart of the matter, I will suggest the

5    following.  This Court routinely notes in the face of such

6    requests that the Bail Reform Act does not include any provision

7    for a stay of a release order, and I should qualify that by

8    saying at the request of the Government.

9         I have stayed the order because of the information provided

10   by Pretrial Services that the monitoring, the supervision,

11   cannot begin until Friday, and it is the Court's intention that

12   the supervision mechanisms be in place.

13        The statute plainly requires that the Government may seek

14   review of a release order by filing a written motion, and I will

15   suggest that the Government comply with the statute.  If the

16   assigned district judge, unbeknownst to me at the moment -- I am

17   not logged into ECF right now -- has entered an order staying

18   the release order, obviously that is operative.  But at the

19   moment, I am not aware of any such order.  Are you?

20             MR. ELIOPOULOS:  I am not, Your Honor.

21             THE COURT:  Do you have an order to present?

22             MR. ELIOPOULOS:  I do not, Your Honor.

23             THE COURT:  Very well.  Thank you.  Put another

24   away, I believe your recourse is through the assigned district

25   judge --
```

1          MR. ELIOPOULOS:  Thank you, Judge.

2          THE COURT:  -- by way of the procedures provided by

3    the statute.

4          MR. ONORATO:  Your Honor, I don't know if

5    Mr. Eliopoulos is aware of this --

6          THE COURT:  Again, just so the record is clear, as

7    to Mr. Rezvanov, the hearing will resume on Monday.  In other

8    words, we are not finished.  The Court did indeed deny the

9    Government's motion for pretrial detention for all the reasons

10   stated; but there is no release order at the moment, and indeed,

11   Mr. Rezvanov will be detained through Monday.

12         MR. ONORATO:  Your Honor, the Government filed -- and

13   I don't know if Mr. Eliopoulos is aware of this or not, but 13

14   minutes ago, they actually filed a motion with Judge Contreras

15   appealing your ruling, asking for a stay in review of your

16   release order in this case, which is odd to me.  But they've

17   already filed it.  It was filed 13 minutes ago while we were

18   still in court.  So given that, my hope is that Judge Contreras

19   will not act on it, but they obviously have been writing this

20   while we were in court before they even knew your ruling.

21         THE COURT:  Then that means that any request of me

22   should be moot.  Perhaps my ruling is erroneous or I will

23   revisit my own ruling.  I, of course, noted there is no

24   provision for the entry of a stay by this Court and suggested

25   that the Government's recourse is the written motion.  The

1    Government has filed the motion, and that would mean that the

2    Court should now note that the Government's request to me should

3    be denied as moot.

4         MR. ONORATO:  One thing I would like to point out to

5    the Court, and I don't want to -- I sometimes get emotional, so

6    I'll try to take the emotion out of it.  But I question the

7    sincerity, the diligence, whatever the right adjective is,

8    because Mr. Gripkey filed the pleading, and in that pleading,

9    he puts the same -- it's basically the same motion he filed for

10   detention, just to Judge Contreras, and they have the same

11   erroneous footnote which misstates the Brady.

12        So they get Brady on Tuesday of last week, they don't

13   disclose it in a footnote on Wednesday, they turn over a 302

14   yesterday replete with that Brady, and then they make a

15   misrepresentation just saying that Mr. Rezvanov met with the

16   Complainant and they knew each other from a bar.  They don't go

17   through all the other things.

18        So I don't know who's minding the store over there, but

19   to do up an order that at this stage in the proceedings is

20   factually inaccurate, just to try to impede their liberty, is

21   unconscionable.  I'd ask the Court to do something for us

22   because I don't know whether Judge Contreras is going to grant

23   the motion to stay, but we have to be ready for a detention

24   hearing on Tuesday if he does grant the stay.

25        So what I would like the Court to do is order the

following, because, again, the Government chose to indict the

case within two to three days.  They elected not to produce

discovery to us.  They're electing now to appeal your decision.

     And I'm sorry that we're here on a holiday weekend, because

these men would love to be home with their families on a holiday

weekend, but I'd ask the Court to order them to produce the

draft 302 and the different versions that the agent had with

Mr. Wasserman so we can prepare for any hearing that may take

place on Tuesday.  I would ask the Court to order them to make

all Brady disclosures.  And I think as I told you --

          THE COURT:  Did the Court already -- why don't you

complete your argument.

          MR. ONORATO:  I'm going on fine tune it.  Mr. Sears

mentioned that we did get a Brady disclosure, which was not in

the agent's 302.  He apparently has no notes of it.  But there

might be other stuff out there that we don't know about that he

might not think is Brady.

     We would like all additional information that they've

learned from the Complaining Witness between yesterday and any

hearing that takes place on Tuesday that affects his credibility

or contradicts anything he said.

     So, for instance, if he testified in the grand jury or a

representation that was made before the grand jury that they now

know is incorrect or inaccurate or false, we would like that

produced in time for the next hearing.

1      I know that the FBI was trying to get information on Spider

2 Kelly's yesterday.  To the extent that they've got any

3 information that not only Demitri, the fourth person, but if any

4 of these other men used a credit card or paid for anything at

5 Spider Kelly's and it's in their possession, I would like that

6 turned over.  I would like the Government, since there's one

7 Government, they know about his fraudulent use of a visa to come

8 the United States, I would like them to --

9      THE COURT:  By "his" you're speaking of the

10 Complaining Witness.

11      MR. ONORATO:  The Complaining Witness, to contact ICE,

12 because all of the information about the false representations

13 about his coming into the United States is Brady, and we would

14 like it for our hearing on Tuesday.

15      I would like Your Honor to have a 302 or a synopsis

16 prepared by the FBI agent who interviewed witnesses at the hotel

17 to produce that information, and I think that's critical for us.

18 I'd like the Court to order Mr. Wasserman and the agent and

19 Mr. Eliopoulos to meet and confer about all the Brady

20 disclosures that need to be made from that interview of the

21 Complaining Witness on that Tuesday.

22      Your Honor, I would like all phone records, including cell

23 phone tower records, that are in their possession that would

24 show that these men were in different locations that the

25 Complaining Witness has alleged at any given point in time,

1    because I think that is also Brady and critical to any

2    determination that the Court would make.  And I would like the

3    Court to order them to produce it by Friday evening at 5:00 p.m.

4         THE COURT:  Thank you, Mr. Onorato.

5    Mr. Eliopoulos?

6         MR. ELIOPOULOS:  Your Honor --

7         THE COURT:  Are you able to take each request in turn?

8    I realize that the requests were numerous.  This portion of our

9    proceeding goes a bit beyond the immediate purpose for which

10   everyone is here, and that is the detention hearing.

11        However, because, as Mr. Onorato noted, the Government has

12   now moved for review of the Court's order, perhaps this is the

13   appropriate time to address what it is that the defendants

14   believe is required in order for them to be able to proceed, as

15   the law contemplates, to offer or proffer further evidence.

16        I don't know whether Mr. Wayne can accommodate everyone by,

17   if we go off the record, preparing a list of what Mr. Onorato

18   asked for or whether Mr. Onorato can simply come back to the

19   microphone and state the requests one at a time.  Perhaps that

20   is more efficient so that you can respond to each one in turn.

21        Perhaps as to some, there will be an agreement, and there

22   will be nothing to debate.  Perhaps as to others, there will not

23   be an agreement, and you can state the Government's contention.

24   But I imagine that all this would be much appreciated by Judge

25   Contreras.  So let's try the Court's suggestion.  Let me ask you

1    to take a seat.

2        I'll ask you, Mr. Onorato, to come back and address the

3    matters one at a time, please, so Mr. Eliopoulos may make note

4    of them.

5            MR. ONORATO:  Sure.  So request No. 1.  Are the draft

6    302s or for the three 302s that are between the interviews of

7    the Complaining Witness with the Government agents.  So --

8            THE COURT:  Very well.  Thank you.  Mr. Eliopoulos.

9            MR. ONORATO:  And any 302s.  Not just the two

10   interviews we know about.  Any that have taken place subsequent,

11   of course, to court.

12           THE COURT:  Mr. Eliopoulos.

13           MR. ELIOPOULOS:  Your Honor, just in the general

14   matter, I believe this discovery request belongs in front of

15   Judge Contreras.

16           THE COURT:  Mr. Eliopoulos, I have to interrupt.  I do

17   not regard this as a discovery request.  This is in the nature

18   of a Brady request.  I have indicated earlier in this proceeding

19   that it has been the Court's hope that Brady material would be

20   turned over.

21       Typically, the Court has no occasion to involve itself in

22   such discussions at a detention hearing, but in this case, it

23   was the Government that brought to counsel's attention and then

24   to the Court's attention that there was at least one disclosure.

25   That was the disclosure made in the footnote, and, thereafter,

1    although not entirely willingly, the Government, by

2    Mr. Wasserman's own count, made as many as three and possibly

3    four additional such disclosures.

4        So this is not a matter arising in a vacuum.  It does not

5    concern discovery.  All I would like for you to represent,

6    please -- all I ask that you do, so that there's a clear record

7    of who has requested what, that you indicate whether as to the

8    first item you agree to do that voluntarily or you don't.

9            MR. ELIOPOULOS:  Your Honor, let me address that

10   twice.  The detention hearing has been completed.  Evidence

11   has been presented.

12           THE COURT:  Well, it has been completed before me to

13   some extent.  It has not been completed as to Mr. Rezvanov, who

14   will come back on Monday.  It is not complete to the extent that

15   the Government has appealed the Court's decision.  So it is not

16   over.  The defendants now make a request.  All the Court would

17   like to know, so that we have a complete record here, is whether

18   or not you agree to voluntarily provide -- and we're taking one

19   item at a time -- the first that has been enumerated.

20           MR. ELIOPOULOS:  Your Honor, I need to get my

21   objection on the record.  My objection is, this request, all

22   those requests belong in front of Judge Contreras.  Mr. Onorato

23   is trying to circumvent going in front of Judge Contreras.  He

24   could file a motion with Judge Contreras.  He could make a

25   written request of this additional discovery.  He can do that.

He hasn't done that.  He needs to file this in front of Judge

Contreras.

THE COURT:  That is likely what will occur.

However, in order to expedite the resolution of the issue, my

question of you is simply whether or not you are prepared -- and

we're taking one item at a time -- to voluntarily produce the

requested information.

MR. ELIOPOULOS:  Your Honor, the Government will

produce the draft 302 that Mr. Onorato was discussing, which was

the draft for the second interview, I believe is what he said.

THE COURT:  I believe his request was -- was it only

for the second one or for the first and the second?

MR. ONORATO:  It was whether there is one for the

first and the second, and any subsequent 302s that will be in

existence.

THE COURT:  Very well.  Mr. Eliopoulos, you just

agreed to produce the "draft," the draft of the second 302.

Do you wish to be heard with regard to whether there is a draft

of the first 302?

MR. ELIOPOULOS:  Your Honor, I have not seen a draft

of the first 302.  Those were not -- if they exist, they were

not provided to me.  I don't know if they were provided to

Mr. Wasserman, if they even exist.  So I cannot make any

agreements with respect to anything that the FBI might have.

And I do note, Your Honor, that drafts generally are not

1    produced, so I cannot even say there is even a draft of the

2    first 302.

3            MR. BENOWITZ:  Your Honor?

4            THE COURT:  Mr. Benowitz.

5            MR. BENOWITZ:  Yesterday, when Agent Brown testified,

6    I asked him that very question, and he said there is always a

7    draft.

8            THE COURT:  The Court recalls.

9        What is the second item, Mr. Onorato?

10           MR. ONORATO:  Okay.  So the second is -- and the

11   second and third all go together.  Any information that impacts

12   the Complaining Witness's credibility.

13       So, for instance, any information that the Government has

14   learned that contradicts anything that the Complaining Witness

15   has said, whether he's done it himself or they found physical

16   evidence or other evidence that would contradict any statements

17   he's made to law enforcement at this point.

18           THE COURT:  Do you agree to produce that voluntarily,

19   Mr. Eliopoulos, or do you decline to do so?  When I say "you"

20   I mean the Government.

21           MR. ELIOPOULOS:  Your Honor, I do not know.  Other

22   than what has already been produced, I do not know what else

23   Mr. Onorato is referring to.

24           THE COURT:  I believe that the gist of the request is

25   an inquiry that you determine whether there is such information,

1    and if there is, to produce it.  The Court obviously has no

2    independent knowledge of anything other than what has been

3    discussed in court.

4        MR. ELIOPOULOS:  It's my understanding that the

5    Government has done that, Your Honor, and has already produced

6    that information to the Defense.  We will endeavor at every

7    stage of the proceeding, if there's anything new that arises

8    that would impinge the credibility of the victim in this case,

9    the Government would turn that over.

10       MR. ONORATO:  I'm not looking for anything new.  If

11   it's new, it doesn't exist yet.  I want what's old.  Obviously,

12   they can't get anything in the future.  But a prime example of

13   this is that the FBI agent wrote a 302 where he learned that our

14   client was not holding a knife to the victim's throat, and that

15   doesn't appear anywhere -- nothing about those identification

16   procedures or what role my client played in the kidnapping are

17   in that 302.

18       So, if Mr. Wasserman doesn't make that disclosure on a

19   Saturday morning after I ask him again, where's the Brady on

20   Friday night, Saturday morning at 7:00 a.m., and I say, hey,

21   Steve, why wasn't that included in your disclosures yesterday,

22   I don't get a response to that.  I get a, why don't you guys

23   just send me what you're looking for.

24       So Mr. Feitel drafts a letter on behalf of all of us,

25   which the Court has.  Nobody's replied to the letter.  Nobody's

1    replied to the letter.  We sent them a letter.  They don't reply

2    to it.  So we're putting our comments on the record.

3            MR. ELIOPOULOS:  Your Honor, my suggestion is that

4    Mr. Onorato file a motion with the Court so we can properly

5    address it as opposed to trying to ambush the Government with

6    all these requests.  This is highly improper, particularly the

7    day before Thanksgiving.  He needs to file a motion, take it up

8    with Judge Contreras.

9        He can make his allegations, and then we can address it

10    properly, not like what he did earlier today where he is arguing

11    that the Court should dismiss the indictment.  He didn't even

12    file a motion which would give the Government time to properly

13    address those things.  This is what he does.  This has to stop.

14    He can file a motion with the Court, and then we can take that

15    up.

16            THE COURT:  Does this mean that the Government's

17    response to the request made by Mr. Onorato is declined?  I

18    simply want our record to be clear.

19            MR. ELIOPOULOS:  Your Honor --

20            THE COURT:  As I've indicated, the Government, during

21    the initial phase of this part of our discussion, argued that

22    the detention hearings are over.  The detention hearings are

23    actually not over to the extent that Mr. Rezvanov will be back

24    on Monday, and the orders are stayed until Friday as to

25    Mr. Shvab and Mr. Alorini.

1           In addition, the Government has sought review of the

2     Court's orders, and as I understand the request of counsel for

3     Mr. Alorini, I imagine that others join.  It is simply in an

4     effort to streamline whatever will occur before Judge Contreras.

5           The Court would expect this would be a relatively

6     noncontroversial matter and that counsel would simply agree to

7     meet and confer after we recess and determine who wants what.

8     At various points during this proceeding, one or the other of

9     you have asked Pretrial Services for something.  The Government

10    has asked Mr. Onorato and Mr. Sears to respond to a concern.

11          This is not surprising in the context of a case pending in

12    this court, that everyone would wish something from everyone

13    else, and I see no reason why this should generate such

14    acrimony.  And I believe it would be in everyone's interest to

15    try to determine what you can do voluntarily to at least ensure

16    that when you appear before Judge Contreras, you can accomplish

17    what it is you hope to accomplish.

18          If the Government refuses to have such a discussion, I am

19    not prepared to order the Government to do so.  I will excuse

20    everyone, but it would be with some degree of concern that there

21    is no reason why there could not be at least a preliminary

22    discussion of who needs what to prepare for Tuesday.

23                MR. ONORATO:  And, Your Honor --

24                THE COURT:  Friday or Monday or Tuesday.

25                MR. ONORATO:  -- I'm willing to talk to Mr. Eliopoulos

1    to try to work it out.

2              THE COURT:  Very well.

3              MR. ELIOPOULOS:  Your Honor, he should have done that

4    from the beginning instead of trying to ambush the Government --

5              THE COURT:  Well, we'll -- Mr. Eliopoulos --

6              MR. ELIOPOULOS:  -- Your Honor, can I make my record?

7    Can I make my record, Your Honor?  He ambushed --

8              THE COURT:  You may.

9              MR. ELIOPOULOS:  -- the Government.  That's what he

10   is good at.  Okay?  He also knows that Mr. Wasserman is not

11   here.  I am not the lead counsel in this case.  He knows that

12   I'm not as familiar with this case.

13        So he comes in front of you, trying to ambush the

14   Government, making requests of things that I may not even be

15   aware of.  And I totally resent that attempt to somehow sandbag

16   me personally and sandbag the Government.  He needs to make his

17   request with the judge.  I'm not saying the Government would not

18   or refuses to make these productions, but he has to do it in an

19   orderly fashion.

20             THE COURT:  Are you suggesting that it is necessary

21   for a judge to order the Government to comply with its Brady

22   obligations?

23             MR. ELIOPOULOS:  No, Your Honor.  Of course that's not

24   what I'm saying.

25             THE COURT:  In the absence of an order from Judge

1   Contreras, the Government would have an independent obligation

2   to do so.  Is that right?

3          MR. ELIOPOULOS:  Absolutely, Your Honor.

4          THE COURT:  And was it not in that spirit in which,

5   according to Mr. Wasserman, he made the disclosure in the

6   footnote of the Government's memorandum?

7          MR. ELIOPOULOS:  Absolutely.  Correct.

8          THE COURT:  What is the basis of your argument that

9   now these requests, which the Court believes can only be

10  characterized as efforts to identify what could possibly be

11  Brady material, be met with the response that it won't be done

12  until Judge Contreras orders it and there should be a motion?

13         MR. ELIOPOULOS:  He should have at least written a

14  letter and sent an e-mail to us.

15         THE COURT:  Well, there was a letter, was there not?

16  Isn't that Mr. Rezvanov Exhibit 3?

17         MR. ELIOPOULOS:  Your Honor, if I may --

18         THE COURT:  Do you have Rezvanov Exhibit 3?

19         MR. ELIOPOULOS:  I do, Your Honor.

20         THE COURT:  Isn't that the letter?  Isn't that a

21  letter?  I'm looking at it right now.  Isn't that a letter from

22  one of the counsel to Mr. Wasserman dated November 19 asking for

23  Brady?

24         MR. ELIOPOULOS:  For some Brady.  Correct, Your Honor.

25  I understand that.

1          THE COURT:  And is there a response four days later?

2   Has the Government responded?

3          MR. ELIOPOULOS:  I do not know if a response was made

4   by Mr. Wasserman, Your Honor, and that's one of the problems I

5   have in this case.  I do not know what has been responded to or

6   what hasn't.  But this is not the opportunity or the time for

7   Mr. Onorato to come before a judge who -- these matters should

8   come to us first, make these requests so we can actually, in an

9   orderly fashion, make a determination what is <u>Brady</u>, what isn't

10  <u>Brady</u>.  That takes some effort to make a determination of those

11  things.

12          THE COURT:  But the defendants --

13          MR. ELIOPOULOS:  I'm not saying that we would hide

14  anything --

15          THE COURT:  -- did come to you, did they not?

16          MR. ELIOPOULOS:  I'm sorry, Your Honor?

17          THE COURT:  Didn't the defendants do as you asked, as

18  you suggested?  I'm not suggesting that was required, but I

19  recall that just a moment ago you said these lawyers should

20  "come to us."  My question is, isn't that what they did?

21          MR. ELIOPOULOS:  They have --

22      (Simultaneous speaking.)

23          THE COURT:  -- that that --

24          MR. ELIOPOULOS:  -- and the Government has responded.

25          THE COURT:  -- required of them to ask, didn't they

1   ask?

2             MR. ELIOPOULOS:  They have, and we have responded.

3             THE COURT:  Where is the response?

4             MR. ELIOPOULOS:  Your Honor, we have given the Defense

5   evidence in their response to their request for evidence.  It's

6   been given.  Okay?  I don't know about every request; I'm not as

7   familiar with those.  I am not privy to all the requests that

8   the Defense has made.

9        But what I'm saying is, at the very least, when Mr. Onorato

10  has this laundry list of information he wants, he should at

11  least send me an e-mail, send Mr. Wasserman an e-mail, so we can

12  make an informed decision as to what needs to be disclosed, what

13  is Brady, what isn't Brady.  We have the obligation and the

14  right to make that first determination.

15            THE COURT:  As I indicated, the Court is involving

16  itself in this matter only because it was the Court's

17  expectation that counsel would agree to stay in the courtroom

18  and at least have a preliminary discussion about when and how

19  this would be accomplished and that you would not set about the

20  exchanges of letters and e-mails and motions.

21        If that is not -- as I indicated, if you are not prepared

22  to discuss with counsel for the defendants their request, then I

23  believe we will recess at this point.

24            MR. ELIOPOULOS:  I suggest --

25            THE COURT:  I thought the matter might be expedited

1    since we are all still here and we have the support of Mr. Wayne.

2    If we could go request by request, you could indicate yes or no.

3              MR. ELIOPOULOS:  Your Honor, I suggest we recess and

4    that I can talk with Mr. Onorato after court, and then if he

5    doesn't like my responses, then he can file a motion with Court.

6              MR. ONORATO:  So here's the problem.

7              THE COURT:  Very well.  You may have a seat,

8    Mr. Eliopoulos.  Mr. Onorato.

9              MR. ONORATO:  (Inaudible)

10             THE DEPUTY CLERK:  Mr. Onorato, please come to the

11   microphone.

12             MR. ONORATO:  -- but he's in Florida.  They're all

13   going to have their nice family Thanksgivings.  I got three guys

14   in orange jumpsuits who are relying on me to do something to get

15   them out of those jumpsuits and back into the community.  I've

16   got a judge who's ordered the Government to produce certain

17   materials.

18      I have a prosecutor who last Wednesday stood before Your

19   Honor, and when I said that I didn't think all Brady has been

20   produced, he said that it was produced.  And he said, I don't

21   care -- quote, "I don't care if Mr. Onorato doesn't believe me."

22   Those were his words.  Okay?

23      So we follow up with requests.  No short of three e-mail

24   exchanges looking for exculpatory material.  No short of another

25   letter asking for exculpatory material.  The Government files a

1   footnote in a pleading today.  Talk about disingenuous.

2   They appealed your order before it was finalized.  It came in

3   13 minutes before the proceeding ended.  So give me a break,

4   disingenuous.

5       I've got human beings who should not be locked up because

6   they've got a Complaining Witness who's lying.  I told them to

7   go ask him yesterday, hey, ask him if he's at Spider Kelly's

8   shooting baskets and shooting pool.

9       Have they done that?  I don't think so.  That will

10  undermine their whole case.  Not one of them has done it.  And

11  if the agent is in the courtroom and they've made efforts and

12  they haven't told us about it, I'm going to go nuts the next

13  time I see them in court.

14      So I'm doing what I need to do to protect someone's

15  liberty.  Do you think I want to work all of this weekend to get

16  ready for a hearing on Tuesday?  Do you think I want to expend

17  all of this time and effort?  No.  I want the Government to do

18  what they have to do.

19      Now, look.  I worked in the U.S. Attorney's Office with

20  Mr. Eliopoulos.  I think very highly of him.  I understand that

21  he entered an appearance in the case later.  I understand that

22  he wasn't present for a lot of the material that was disclosed

23  to Mr. Wasserman.  But at some point, at some point, he's going

24  to be part of this case.  And things have happened in it and

25  there's a history, and when you're a prosecutor and you're on a

1    case, you're going to get tagged with the constructive

2    knowledge.

3         And if Mr. Wasserman's not around minding the store, then

4    Mr. Eliopoulos is here in court having to do that, where does it

5    leave these guys?  Well, sorry.  Mr. Wasserman had a family

6    vacation, so you can't have the material that's going to get you

7    out of court.  Sorry.  What are we supposed to do?

8         So I'm hired to fight for someone and to do what I think is

9    right.  And if Mr. Eliopoulos is mad at me for that, so be it,

10   but I'm going to do my job.  I'm happy to discuss what I've

11   asked with -- you know, through him and with him, and he was

12   copied on the e-mails between myself and Mr. Wasserman.

13        Now, I get that Mr. Eliopoulos was deferring to him because

14   he's designated as the lead AUSA.  But you're appealing these

15   guys, you know, trying to keep them locked up over the holiday

16   weekend and not giving me anything.

17        So I'm going to come before Judge Contreras on Tuesday not

18   knowing anything new, and they're going to come in and say you

19   got everything wrong, Judge Robinson.  And what am I going to

20   say but, by the way, Judge, look at all the stuff they haven't

21   provided to me?  So I'm happy to talk to him at a recess.

22             THE COURT:  Thank you, Mr. Onorato.

23        Mr. Benowitz, is there anything on behalf of your client?

24             MR. BENOWITZ:  Nothing further, except I would adopt

25   the arguments of Mr. Onorato, and in light of the Government's

1    position, I would ask the Court to not stay its release order

2    until Friday.

3         THE COURT:  The Court will deny the request to vacate

4    the stay of the release order till Friday.  The sole purpose for

5    which that order was entered was the purpose set forth on the

6    record by Pretrial Services.  That is, Pretrial Services cannot

7    implement the order before Friday, and the Court intended that

8    the stay pending implementation remain.

9         Mr. Feitel.

10        MR. FEITEL:  I join with my colleagues.  I find the

11   characterization of our behavior as sandbagging to be wildly

12   inaccurate since I sent a letter on a Saturday morning.  That

13   will be almost five days ago.

14        In any event, I will see Your Honor on Monday with my

15   client.  I spoke to Mr. Atencio from Pretrial, and we'll try to

16   be organized so that we can hopefully be brief when we return.

17   Thank you for your patience in this matter.

18        THE COURT:  Very well.  Thank you, Mr. Feitel.

19        MR. FEITEL:  And have a happy holiday.

20        THE COURT:  And the same to you.

21        MR. BENOWITZ:  Your Honor, I just need to approach

22   *ex parte* on that matter.

23        THE COURT:  Mr. Benowitz.

24        MR. ONORATO:  Your Honor, we're requesting like a

25   fifteen-minute recess to see if we can work out our differences.

1    I wasn't hoping to adjourn because I still stand that I need all

2    those things that I said.

3         THE COURT:  What we will do is, first, I will hear

4    from Mr. Benowitz concerning what I believe is the follow-up

5    with respect to the matter addressed *ex parte* this morning,

6    which I have already determined was appropriately addressed

7    *ex parte*.  Then we will take the recess.

8         MR. ONORATO:  Thank you.

9         THE COURT:  I will invite everyone to stay and confer

10   for a few minutes.  If you've reached an agreement, you may

11   stay, if not, I will excuse you.

12        (*Ex Parte* Bench Conference on the Record)

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████████

23   ████

24   ████████████████████████████████████████

25   ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

(End of *Ex Parte* Bench Conference)

(Recess from 3:47 p.m. to 5:14 p.m.)

THE DEPUTY CLERK:  We are now back on the record.

THE COURT:  Thank you.

Mr. Feitel, would you please confirm that your client is able to hear?

MR. ONORATO:  He nodded to me that he could.

THE COURT:  Very well.  Thank you very much.

Mr. Onorato, you are at the podium, so I will hear from you first.

MR. ONORATO:  Thank you, Your Honor.

So, Your Honor, it's always better to have a neutral arbiter talk to parties, and the parties did take heed to what the Court said.  We went outside and then came back in the courtroom; and Mr. Eliopoulos and I have an understanding and an agreement on how we'll proceed, and I think that there's no further need for us to request any relief from the Court.

THE COURT:  Very well.  Thank you very much, Mr. Onorato.  Mr. Eliopoulos?

MR. ELIOPOULOS:  That's correct, Your Honor, so I don't think there's anything further.

THE COURT:  Very well.  I thank all of you for your

1    willingness to confer.

2         MR. ONORATO:  And I thank Mr. Eliopoulos for

3    conferring.

4         THE COURT:  Thank you.  There's one logistical matter

5    I would like to address before we recess.  I will suggest that

6    you speak to Mr. Wayne regarding the preparation of a transcript

7    by him and by his colleague who assisted Monday, Tuesday, and

8    this morning.

9         I imagine that you will have arguments when you appear

10   before Judge Contreras concerning what happened at the hearing.

11   The minute entry of necessity will be confined to the matters

12   typically addressed.  That is, there will be no discussion of

13   what findings the Court made.  It is the ruling that will appear.

14        So please speak with Mr. Wayne when we recess about the

15   transcript so that you will be prepared to support your

16   arguments regarding what did and did not occur, what evidence

17   was and was not offered when you appear before Judge Contreras.

18        Now, is there anything further at this time?

19   Mr. Eliopoulos, anything further on behalf of the United States?

20        MR. ELIOPOULOS:  Your Honor, I just have a few more

21   matters.  Actually, I'm just kidding.

22        (Laughter)

23        No.  That's all from the Government.

24        THE COURT:  Thank you, Mr. Eliopoulos.  Mr. Onorato?

25        MR. ONORATO:  No, but Mr. Eliopoulos did mention that

1   he thought Judge Contreras wanted us to call, and I don't know

2   if the Court has heard anything about that or not.

3         THE COURT:  I have heard nothing.  If you have that

4   instruction, then obviously you must follow it.

5         MR. ELIOPOULOS:  Thank you, Your Honor.

6         THE COURT:  Thank you.

7      Mr. Benowitz, anything further?

8         MR. BENOWITZ:  Nothing further, Your Honor.

9         THE COURT:  Mr. Feitel?

10        MR. FEITEL:  Nothing further until return of court.

11        THE COURT:  Very well.  Thank you very much.  We are

12  in recess.  Mr. Alorini, Mr. Shvab, and Mr. Rezvanov, please

13  return with the marshal.  Counsel, you may be excused.

14     Mr. Volsky and Ms. Paramonova, we thank you very much for

15  your assistance to the Court.  Mr. Wayne, thank you very much.

16        (Proceedings adjourned at 4:18 p.m.)

17

18

19

20

21

22

23

24

25

*  *   *   *   *   *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


_____
BRYAN A. WAYNE