UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           :

                    v.              :
                                        Case No. 1:16-cr-00202-RC-1,2,3 (RC)
SULTAN ALORINI,                     :
ANDRIY SHVAB,                       
ELDAR REZVANOV,                     :

            Defendants.             :

**DEFENDANTS' JOINT RESPONSE TO GOVERNMENT'S
MOTIONS FOR EMERGENCY STAY AND FOR REVIEW
AND APPEAL OF RELEASE ORDERS**

## INTRODUCTION

Defendants Sultan Alorini, Andriy Shvab, and Eldar Rezvanov respectfully submit this response in opposition to the Government's Amended Motion for Emergency Stay and For Review and Appeal of Release Orders.[1]  The defendants are charged in a one count Indictment with a kidnapping that is alleged to have occurred between September 8 - 9, 2016 and involved the transportation of an unidentified victim from the District of Columbia to Maryland.[2] According to the Government's theory, the Complainant was forcibly kidnapped on November 6, 2016 from in front of the Grand Hyatt hotel in Northwest Washington, D.C., thrown in the back of a sedan, where he was handcuffed and restrained and his eyes covered over, and then was driven around for several hours before being taken to Hyattsville, Maryland.

---

[1] The defendants simultaneously ask this Court to dismiss the Government's Motions For Emergency Stay and For Review and Appeal of Release Orders.  The government failed to comply with this Court's Order, dated November 23, 2016, requiring it to "file an amended motion before 7:00 AM, November, 2016."  Contrary to the Court's Order, the government filed its amended motion at 7:17 AM.  This Court should find that the government waived, or defaulted, its appeal when it chose to not comply with the Court's explicit Order.

[2] The Indictment fails to allege the essential element that a "person" was kidnapped and does not identify any victim by name or otherwise.

At the conclusion of a three-day detention hearing, which included exhaustive testimony from the government's lead case agent, the Magistrate Court found that there was "scant" evidence that the defendants committed the abduction of the complaining witness, which he alleged took place on the evening of November 6, 2016, in Washington, D.C. *Tr. 11/23/2016 at p. 103*. Indeed, the government acknowledged after repeated questioning by the Magistrate Judge, the complaining witness **never identified the three defendants** as the persons that allegedly kidnapped him in the District of Columbia.

The Magistrate Judge further noted that the government had been unable to corroborate the complaining witness's allegation that he was kidnapped in the District of Columbia, despite having spoken with witnesses working at the hotel or in the vicinity at the time of the alleged abduction. Likewise, no surveillance video or other independent evidence corroborated the Complainant's allegation. *Tr. 11/23/2016 at p. 105*.  Other testimony at the detention hearing established that the Complainant spoke with an associate of his in Italy on November 8, 2016 and failed to mention that he had been kidnapped.

The Complainant is a Latvian citizen who entered the United States in September, 2016. The Complainant's credibility was severely undercut by the revelations that: (1) he was incarcerated for more than two years in Latvia for credit card fraud; (2) was dispatched to the United States by a criminal organization in Europe for the express purpose of committing credit card fraud; (3) after arriving in the United States had received computer equipment to create phony ATM card from an unknown associate; and (4) had used the equipment to manufacture fraudulent ATM cards, which he used to steal thousands of dollars from local area banks. Moreover, the Complainant provided multiple inconsistent versions of his alleged abduction and repeatedly lied to the FBI agents and federal prosecutors assigned to this case - with apparent

government sanctioned impunity. The Magistrate Judge found that the Government has made "four of five" begrudging disclosures of exculpatory information to the defense, which the Court characterized as "inordinate in a relatively short period of time." *Tr. 11/23/2016 at pp. 106-07.*

Finally, the Court found that there was no reason to believe that any of the defendants posed a threat to anyone in the relevant "community" for purposes of the bail statute, particularly since the Complainant was in a secure location, with meals and lodging apparently being provided at Government' expense." Tr. 11/23/2016 at p. 109.

After a careful consideration of all the factors in the bail statute, including the defendants' histories and characteristics, as well as the risk of danger to the community and the risk of flight should they be released, the Magistrate Judge denied the Government's request for detention. *See* 18 U.S.C. § 3142(g). For all the reasons articulate by the Court below and those that follow, this Court should deny the government's motion for a stay of the defendants release orders and affirm the Magistrate Judge's denial of the government's detention motion.

## LEGAL ANALYSIS

### I.   GENERAL LEGAL PRINCIPLES

In <u>Stack v. Boyle</u>, 342 U.S. 1 (1951), the Supreme Court recognized the significant principle that an individual should not have to suffer imprisonment on a charge for which they have yet to be convicted and that reasonable conditions of release need to be considered in light of the specific individual before the court. More recently, the Supreme Court has reinforced those principles by holding that "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty th[e] [Fifth Amendment] protects." <u>Zadvjdas v. Davis</u>, 533 U.S. 678 (2001); *see also* <u>Foucha v. Louisiana</u>, 504 U.S. 71, 112 (1992) (describing freedom from physical restraint as being at the core of

constitutional rights under the Fifth Amendment); *see also* <u>United States v. Salerno</u>, 481 U.S. 751, 755 (1987) ("In our society liberty is the norm and detention prior to trial or without trial is a carefully limited exception.").

Consistent with Supreme Court precedent, the United States Code empowers this Court to use its broad authority and judicial powers to fashion terms and conditions of release from a wide array of options.  *See* 18 U.S.C. § 3142(c).  Indeed, the Code contemplates release in *every* case where the Court can "reasonably assure" that the defendant will appear at subsequent proceedings and will not pose a danger to the community.  18 U.S.C § 3142(b).

Speculation about a defendant's potential failure to appear is not sufficient to warrant detention. "Section 3142 speaks of conditions that will 'reasonably' assure appearance, not guarantee it." <u>United States v. Xulam</u>, 84 F.3d 441, 444 (D.C. Cir. 1996); *see also* <u>United States v. Orta</u>, 760 F.2d 887 (8th Cir. 1985) (*en banc*).  To require a "guarantee" would contradict the framework and clear intent of the Bail Reform Act of 1984, which was that Congress intended for detention to apply only to a "small number" of dangerous defendants.  <u>Id</u>. at 890-91.  When making the "reasonable" assurance determination, courts must consider "the nature and circumstances of the offense, including whether it is violent or nonviolent in nature; the weight of the evidence; the history and characteristics of the person, including her character, family ties, employment, length of residence in the community, community ties, past conduct, criminal history, and record of court appearances; and the danger the defendant poses to the community if released."  <u>United States v. Hanson</u>, 613 F. Supp. 2d 85, 88 (D.D.C. 2009) (citing 18 U.S.C. § 3142(g)).

II.     **THE GOVERNMENT'S EVIDENCE FAILED TO ESTABLISH THAT THE COMPLAINANT WAS ABDUCTED IN WASHINGTON, D.C. OR THAT THESE DEFENDANTS PARTICIPATED IN ANY SUCH KIDNAPPING**

Prior to the commencement of the detention hearing, the Magistrate Judge ordered the Government to both: (1) search for, and produce, exculpatory impeachment material; and (2) make its lead case agent, Special Agent Michael Brown, available for examination by defense counsel. Although the prosecution initially agreed to make its agent available, the government later filed a motion to preclude the defendant's from calling any government witnesses (Doc. No. 13), which was denied.  As a result, Special Agent Brown testified over the course of two days, in which he provided substantial detail regarding the Complainant's allegations as well as his false and inconsistent versions of events. The extraordinary amount of time devoted to a detention hearing was necessitated by the Government's decision to delay revealing exculpatory evidence - already in its possession – in a piecemeal fashion, despite the defendant repeated emails and letter requesting its immediate production. The following is a summary of the most critical false statements and inconsistencies in the Complainant's allegations.

According to SA Brown - and confirmed by an FBI 302 - the Complainant initially alleged that on the evening of November 6, he had been drinking by himself at the Mad Hatter bar in the District of Columbia. After leaving the bar (where he allegedly lost his wallet), he began to walk to a nearby CVS drugstore and while passing the Grand Hyatt hotel on H Street, NW, a black sedan pulled up and three individuals "pulled" him into the car and drove away. The Complainant stated that he was immediately handcuffed, his legs were restrained by a belt, and duct tape was placed over his eyes.  He also claimed that there were witnesses on the street,

including a hotel attendant, at the time he was abducted.[3] Importantly, the Complainant stated that he could not see his assailants because of the duct tape that had been placed over his eyes. This failure of proof is ignored in the Government's filing before this Court. [4]

According to the Complainant – who was ultimately identified as Daumants Petrovs - despite being restrained and blinded, he was able to see that he was transferred from the black sedan to a silver vehicle, even though he was unable to see his assailants.  More incredibly, Petrovs claimed to law enforcement that he was also able to "secretly" take a video of the unidentified subjects "with his phone while in the car but the video was no longer there when the phone was reviewed by the FBI."  FBI 302 dated 11/21/2016.  Petrovs went on to claim that after having been driven around for several hours, he was brought to the apartment in Hyattsville where he was beaten and kicked "every 10 minutes" and, with the exception of one sip of water and a small piece of sandwich, he was forced to drink vodka.

Significantly, Petrovs told agents that he did not know any of his assailants and only learned their names by overhearing their conversations.[5]  He also claimed to not know why he had been targeted but speculated that it may have been because he often paid his bar bills with $100 bills.  He also claimed to have come to the United States only because "he had never done so before" and had used money he saved while incarcerated in Latvia, to fund his trip. According to Petrovs, he had run out of money two weeks prior to his abduction, and had been "living on the street."  When law enforcement reviewed Petrovs's phone, the saw a contact that had been made with an individual named "Dutchess" both before and after his alleged abduction.

---

[3] Agent Brown testified that the FBI had interviewed several hotel employees and none of the witnesses interviewed reported seeing what the complainant had described.

[4]  Indeed, despite Government counsel *finally* conceding this point during argument on November 23, the Government claims before this Court in its amended motion that the Complainant "identified the three detained males…as participants in his kidnapping."  *See* DE 26 at p.4.

[5] Towards the end of his interview, Petrovs stated that he may have seen defendant Rezvanov before at a bar.

Petrovs, incredibly, claimed not to know "Dutchess" and speculated that his alleged assailants must have entered that contact into his phone.[6]

When Petrovs' was interviewed for a second time on November 14, 2016 in the presence of two federal prosecutors and SA Brown, the story about his abduction as well as his reasons for being in the country, changed dramatically.  First, Petrovs now claimed that another individual had provided him with $5,000 to travel to the United States to perform construction work. Over the course of the interview, however, Petrovs finally admitted that not only had he not traveled with his own money but that he had specifically traveled to the United States to engage in credit card fraud.  Indeed, Petrovs claimed that an individual, not any of the defendants, had met him in the District of Columbia following his arrival and provided him with the equipment to create and use fake gift cards.  He further admitted to engaging in the fraud for a period of four days before losing the equipment while drinking at a bar. He claimed that the individual who had arranged for his travel to the United States told him that he would travel to the area "to fix things."

More importantly, Petrovs completely contradicted his earlier statements that he was not familiar with any of his alleged assailants.  Indeed, he now claimed that he had met defendant Rezvanov at a bar on Halloween night, and that they had exchanged phone numbers. He further claimed that he and Rezvanov had met up "a couple more times" for drinks.  He also told agents that he had never been at the Mad Hatter bar on the night in question.  He also claimed, for the first time, that Rezvanov had sent him a text to meet at the Grand Hyatt hotel just prior to his abduction.

Of great significance to the Magistrate Judge, Petrovs was confronted by agents with information they had received from a witness in Italy that Petrovs had contacted him on

---

[6] No explanation was given as to how Petrovs' alleged assailants could have entered a contact into his phone prior to his abduction, and law enforcement apparently did not ask for one.

November 8, two days after his alleged abduction.  That witness reported that he had spoken with Petrovs and that Petrovs had informed him that he was on his way to meet with an individual that he knew from his stay in a Latvian prison.  Petrovs did not deny making the call, or the statement, but claimed that the meeting never occurred and that he had made it up.  No explanation was given for why he fabricated the meeting, or how he was able to make contact with a friend while in supposed captivity, and agents apparently did not seek one.  Similarly, no explanation was provided as to why Petrovs did not advise his friend in Italy that he had been abducted during their conversation.[7]

Thus, despite the fact that Petrovs was found with injuries at the Hyattsville address on November 9, there were substantial reasons to doubt the story that he had been abducted on November 6 in Washington, D.C.  First, no evidence admitted at the detention hearing corroborated his presence in D.C. on the night in question, and the Government's own investigation had failed to identify a single witness to his abduction, despite its occurrence in a well-lit and populated area in front of a busy hotel.[8]  Second, Petrovs' apparent contact with Dutchess both before and after his alleged abduction, the latter of which would have occurred during a period of time when he is alleged to have been restrained and blinded, raises serious doubts about the date and time of his alleged kidnapping.  Finally, Petrovs' admission, after being confronted, that he had contacted a friend in Italy after having allegedly been kidnapped, restrained and beaten, strongly suggests that he had not been abducted prior to the November 8

---

[7] Although Petrovs claimed that he had been untruthful earlier to avoid getting in trouble, he did not explain how providing additional information about his relationship with Rezvanov implicated him in any wrongdoing.

[8] Indeed, SA Brown admitted that it was unusual for a potential abductor to lure his intended victim to a crowded location with multiple potential witnesses. See Tr. 11/22/2016 at p. 62.

phone call.[9]

For all of these reasons, the Magistrate Judge correctly gave little weight to Petrovs' version of his abduction. Because the government could not establish any nexus between the evidence found in Hyattsville to Petrovs' claimed abduction in D.C., other than Petrovs' questionable and well-contradicted story, it found the government's evidence of an abduction in D.C. on December 6 to be "scant," and weighed that factor in favor of defendants. Petrovs' credibility issues on this crucial determination, the only facts that would give rise to a prosecution in D.C. federal court, remain unrebutted in the government's amended appeal.

## III.   LACK OF INVESTIGATION

### BRADY

The Government returned an Indictment in this case on November 15, 2016, the day before the scheduled Arraignment. The defense believes that the precipitous return of the Indictment – in a case where the Government has admitted that it has conducted only a cursory investigation – was calculated to avoid any detention hearing before the Court. Unfortunately for the Government, the Magistrate Judge ordered the Government to make SA Brown available at the hearing.

During the course of the detention hearing, the Government made numerous late and begrudging *Brady* disclosures. The Magistrate Judge correctly considered the Government's conduct when evaluating the strength of its case. The record of the detention hearing established that on multiple occasions the Government represented that it had complied with its *Brady* obligations, only to later make disclosures of information already known to the government. The

---

[9] This fact is particularly suspicious because the friend Petrovs contacted in Italy is the same individual he later informed about the kidnapping, that very evening, and communicated the ransom request to. The Government had no explanation why Petrovs would call his friend after being abducted, not report the abduction, then later messaged him that he had been abducted.

defense believes that the Government concealed relevant and material exculpatory information contradicting Petrovs' claims that he had been abducted in D.C. on December 6, 2016 because the prosecutors were concerned about the strength of the case.

One example is the contradictory and false statements by the Complainant is his version of events concerning whether he knew the defendants. On November 9, 2016 Petrovs originally reported not knowing his kidnappers at all.  Later, he stated that he "might' have seen Rezvanov before at a bar.  On November 14, 2016 Petrovs was interviewed by SA Brown and the prosecutors in this case at the office of the United States Attorney for the District of Columbia. During that meeting Petrovs stated, among other things, that he knew Rezvanov, had exchanged phone numbers, had hung out with him on multiple occasions, and had texted him to meet up on December 6, 2016.

The next day, on November 15, 2016, the Government filed a detention motion, which included a footnote that purported to disclose the inconsistent statements made by Petrovs during his interviews.  *See* DE 5 at p. 4.  This information was not disclosed to the defense until the morning before the second day of the detention hearing on November 22, 2016. [10]

The late disclosures continued to accrue. On November 18, 2016, the Government finally produced a search warrant affidavit that revealed for the first time Petrovs' call to his friend in Italy during the time when he was alleged to have been kidnapped. On November 19, 2016, the Government disclosed that the person identified in a photograph holding a knife to the

---

[10] Although the defense was not aware that the Government had failed to disclose *Brady* information, counsel sent numerous emails and a formal *Brady* letter to the Government. Thus, on November 15, counsel for defendant Alorini sent an email to Government counsel requesting all *Brady* information including multiple specific requests regarding all FBI 302 reports or other documents that would show Petrovs had made: (1) any false statements to any law enforcement officer; or (2) had engaged in any criminal activity. On Saturday, November 19, 2016 defense counsel jointly sent a *Brady* request to the prosecutors. A copy of that letter is attached hereto.

Complainant's throat was not defendant Alorini, as previously represented, but was another person entirely.

Finally, on November 22, 2016, the Government finally disclosed a copy of the FBI 302 of the November 14, 2016 interview of Petrovs. The disclosure was made only after during cross-examination of SA Brown it was revealed that the agent had not taken any notes during the interview, and that incredibly, the "draft" version of the report was shown to the prosecutors in this case, who had to augment it with *Brady* information that SA Brown had failed to memorialize. Moreover, the report revealed *substantial Brady* information that went to the very heart of the allegations in the indictment, including additional details about Petrovs' own criminal activities and relationship with other individuals, unrelated to the defendants, whom he was scared would come after him. It also provided corroboration that Petrovs had indeed called his friend in Italy during the time when he claimed to have been abducted. Although the Government claimed that it could not have disclosed the information in the 302 earlier because the report was in "draft" form, it is clear that the exculpatory information was in the Government's long before it was disclosed to the defense.

The government's haphazard and nonchalant efforts to accurately record and memorialize Petrovs' versions of the offense, as well as its reluctance to timely disclose relevant exculpatory information, further influenced the Magistrate Judge's opinion that the Government's case against these defendants in D.C., was lacking. Indeed, the Government's repeated failure to turn over *Brady* information, despite its willingness to declare it had complied with its obligations, seriously calls into question whether additional *Brady* information relevant to detention, and the offense, has not been disclosed.

IV.    **THE HISTORY AND CHARACTERISTICS OF THE DEFENDANTS, RISK OF FLIGHT AND POTENTIAL DANGER TO THE COMMUNITY**

a.  **Sultan Alorini**

Defendant Alorini proffered and admitted substantial evidence to support the Court's finding that there are adequate conditions of release to satisfy any concerns over his risk of flight or danger to the community.  First, Mr. Alorini is a Legal Permanent Resident who has resided in the United States since 2006.  He graduated with a bachelor's degree in IT from George Mason University and obtained a masters in IT from Marymount University in Arlington, Virginia.  He has no criminal history and has had no prior contact with the criminal justice system.  While he is originally from Saudi Arabia, he is married to an American citizen and has a three-year-old son.  Mr. Alorini's two sisters reside together in Arlington, Virginia, and are students.  His older sister is currently attending Howard University, where she is expected to obtain a Ph.D in IT.  His younger sister is currently obtaining her masters in IT from Marymount University.

At the time of his arrest, Mr. Alorini was a full-time employee at ECC IT in Rockville, Maryland.  Indeed, Mr. Alorini admitted evidence by way of his ECC IT billing sheet, as well as still-frame photos of video surveillance, establishing that he had been at ECC IT for approximately 8-9 hours *every day* (November 7, 8 and 9) during the time frame Petrovs claims to have been held at the Hyattsville address.[11]   In addition, despite the government's claims that Mr. Alorini poses a risk to the community if released, the government presented *no* evidence that Mr. Alorini knows Petrovs, knows any of his friends or family, or even where they reside.  The government similarly failed to produce *any* evidence that Mr. Alorini knows any individual in Italy or Latvia, let alone those that may be known to Petrovs.  The government's unfounded argument that Mr. Alorini's mere release on stringent condition somehow increases the danger to

---

[11] There was no evidence presented to establish whether Alorini had been at the Hyattsville address on those dates, as opposed to with his wife and son, except for the time he was apprehended.

some unknown person in some unknown location should be ignored.  Similarly, the mere fact that Mr. Alorini has family in Saudi Arabia does not establish a risk of flight.  Instead, the government must prove an intent to flee, which it has failed to do.  *See* Truong Dinh Hung v. United States, 439 U.S. 1326, 1329 (1978) (stating that while "these considerations suggest opportunities for flight, they hardly establish any inclination on the part of the applicant to flee").

It should come as no to surprise to this Court that in light of the evidence presented at the detention hearing, the Magistrate Court found that the government had failed to establish, by clear and convincing evidence, that Mr. Alorini's release on conditions would present a danger to the community, and that the government failed to prove, by a preponderance, that Mr. Alorini poses a risk of flight.  This Court should similarly find that the conditions of release imposed by the Magistrate Judge will reasonably assure Mr. Alorini's appearance and the safety of the community.

### b.  Andriy Shvab

Defendant Shvab proffered substantial evidence to support the Magistrate Judge's finding regarding risk of flight or danger to the community.  Mr. Shvab emigrated to the United States from the Ukraine in 2002 with his family.  He lived in Alexandria, Virginia, where he attended and graduated from T.C. Williams High School.  Mr. Shvab became a United States citizen in 2008; his Certificate of Naturalization was proffered and admitted as evidence.  Mr. Shvab obtained a dual degree in Economics and Foreign Affairs from George Mason University in 2012.  For the past several years he has worked as a regulatory affairs analyst for the American Fuel and Petrochemical Manufacturers.  Mr. Shvab's parents and brother live in Alexandria, VA; he has extended family that live throughout the United States.  Counsel proffered to the

Magistrate Judge that he had taken possession of Mr. Shvab's United States passport and two (2) expired Ukrainian passports.

Mr. Shvab has absolutely no prior contact with the criminal justice system. SA Brown testified that based upon his investigation, there is no evidence that Petrovs knew or had ever socialized with Mr. Shvab before the alleged kidnapping.

Like Mr. Alorini, the government presented *no* evidence that Mr. Shvab knows any of Petrovs' friends or family, or their location, or *any* evidence that Mr. Shvab knows any individual in Italy or Latvia, let alone those that may be known to Petrovs.  The government's assertion, without any foundation or scintilla of evidence adduced at the detention hearing, that Mr. Alorini's mere release on stringent conditions somehow increases the danger to some unknown person in some unknown location should also be ignored.

Based upon the evidence presented at the detention hearing, the Magistrate Judge found that the government had failed to establish by clear and convincing evidence that Mr. Shvab's release into the High Intensity Supervision Program (HISP) would present a danger to the community, and that the government failed to prove under a preponderance standard that Mr. Shvab poses a risk of flight.  This Court should also find that the conditions of release imposed by the Magistrate Judge will reasonably assure Mr. Shvab's the safety of the community and his appearance in court.

### c.  Eldar Rezvanov

The Magistrate Judge denied the Government's request to detain defendant Rezvanov without bond, but his conditions of release have not yet been established. Mr. Rezvanov entered the United States in 2009 on a student visa, but at the time of his arrest in this case, his visas had expired. Mr. Rezvanov has an apartment in Arlington, Virginia and his counsel has confirmed

that he can return to the residence. Moreover, counsel has also confirmed that his roommate and long time friend is willing to act as his custodian if the Court grants him release. These details need to be independently verified by Pretrial Services (because the roommate has been out of the United States for the Thanksgiving Holiday) and Magistrate Judge Robinson has scheduled a hearing on Monday, November 28, 2016 to further consider conditions of release.

Because of Rezvanov's overstay on his visa, the Government had an immigration detainer lodged against him. As a result, Pretrial Services initially determined that he was not eligible for the HISP Program, although counsel has asked for that decision to be reviewed. In addition, defendant Reznavov has an Accelerated Rehabilitative Disposition ("ARD") from 2014 in Pennsylvania for Access Device Fraud. Under Pennsylvania law, an ARD is not considered a criminal conviction. The defendant was not in violation of any of his conditions of release in the Pennsylvania case at the time of his arrest in Washington, D.C. The defendant has a return of court date in Pennsylvania for early in December 2016 for a related matter. The defendant is willing to abide by any conditions of release imposed by the Magistrate Judge, including GPS monitoring, home detention, and placing his passport in the Court's registry. Although the Complainant contends that he met Rezvanov before the alleged kidnapping, there is no evidence to even suggest that the two were involved in any criminal conduct together.

V.     **DISCOVERY REQUEST**

The defendants again, as they have done informally and on the record in the detention hearing, request that the Court compel the government to provide discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure.  As the Court knows, the defendants were arrested on November 9, 2016. The government chose to quickly present this matter before a grand jury and obtained a one-count indictment on November 15, 2016.  As the defendants were arraigned

on November 16, 2016, 18 U.S.C. § 3161(c) provides that trial must occur within seventy (70) days of that date.   Tomorrow's hearing marks day 10 of that seventy day period and the defendants have still not received discovery as is required.

### CONCLUSION

For all of these reasons, the defendants request that this Court deny the Government's request to overturn the Magistrate Judge's decision to deny pretrial detention.

Respectfully submitted,

SULTAN ALORINI,
By Counsel

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
*Attorney for Sultan Alorini*
SCHERTLER & ONORATO, LLP
1101 Pennsylvania Avenue, NW, Suite 1150
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177
ssears@schertlerlaw.com


ANDRIY SHVAB
By Counsel

/s/ David Benowitz
David Barry Benowitz
*Attorney for Andriy Shvab*
PRICE BENOWITZ LLP
409 Seventh Street, NW
Suite 200
Washington, DC 20004
(202) 271-5249 (cell)
Fax: (202) 664-1331
Email: david@pricebenowitz.com


ELDAR REZVANOV

By Counsel

/s/ Robert A. Feitel
_____
Robert A. Feitel
*Attorney for Eldar Rezvanov*
LAW OFFICE OF ROBERT FEITEL
3509 Connecticut Ave, NW
Suite 1291
Washington, DC 20008
(202) 255-6637
Fax: (202) 450-6134
Email: RF@RFeitelLaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent to Government counsel and counsel for all defendants via the Court's electronic filing system, this 25th day of November, 2016.

*Robert Feitel*
_____
Robert Feitel